**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

UNITED STATES OF AMERICA,

    Plaintiff,

vs.                                                                           No. CR 00-1610 JP

JAIME ENRIQUEZ, and
LETICIA TORRES-DREWEL,

    Defendants.

## MEMORANDUM OPINION AND ORDER

This case was tried before a jury as to Defendant Jaime Enriquez on January 20 through 22, 2004 in Las Cruces, New Mexico.[1] The Defendant, Jaime Enriquez, was charged in a two-count Indictment. Count I charged a marijuana distribution conspiracy, and Count II charged possession with intent to distribute marijuana. On January 21, 2004, at the close of Plaintiff's case in chief, Defendant Enriquez moved for judgment of acquittal under Rule 29 of the Federal Rules of Criminal Procedure. The Court reserved ruling and took the motion under advisement. The trial continued and the parties presented additional evidence. After deliberating for several hours, the jury informed the Court that it was unable to reach a unanimous verdict on one of the counts. The parties agreed to accept a partial verdict. The verdict was guilty on Count I, the conspiracy count. Thus the motion for judgment of acquittal applies only to Count I.[2] Counsel requested an opportunity to submit post-trial briefs on the motion. The Court, having carefully

---

[1] The co-Defendant Leticia Torres-Drewel entered a plea of guilty on August 11, 2003 and testified for Plaintiff, United States of America, at the trial.

[2] On June 1, 2004 the Court entered an Order, to which the parties agreed, that declares a mistrial as to Count II and reserves the right of the government to re-try Defendant Enriquez on Count II.

considered all the evidence presented in Plaintiff's case in chief, the arguments of counsel, and the relevant case law, finds that Defendant Enriquez' motion should be denied.

### Standards for Motion for Judgment of Acquittal.

In considering a motion for judgment of acquittal, the trial court must view the evidence in the light most favorable to the government and then determine whether there is substantial evidence from which a jury could have found the accused guilty beyond a reasonable doubt. United States v. Monts, 311 F.3d 993, 1000 (10th Cir. 2002). "The jury, as fact finder, has discretion to resolve all conflicting testimony, weigh the evidence, and draw inferences from the basic facts to the ultimate facts." United States v. Valadez-Gallegos, 162 F. 3d 1256, 1262 (10th Cir. 1998). However, a conviction may not be upheld "by piling inference upon inference. An inference is reasonable only if the conclusion flows from logical and probabilistic reasoning. The evidence supporting the conviction must be substantial and do more than raise a suspicion of guilt." Id. (internal quotations and citations omitted).

Rule 29(b) of the Federal Rules of Criminal Procedure provides, in pertinent part, that if the court reserves decision on a motion for judgment of acquittal, "it must decide the motion on the basis of the evidence at the time the ruling was reserved." In its brief Plaintiff cites some testimony from its rebuttal case in opposition to the motion for acquittal. The Court has not considered any evidence presented during the Defendant's case or during the government's rebuttal case in ruling on this motion.

### Factual Background.

This case involved the transporting of several bundles of marijuana weighing over 600 pounds to Tucson, Arizona from a dropoff point in a remote desert area of southwestern New

Mexico known as the "bootheel." The events occurred in early March 2000. Because of logistic problems, the operation took three days to accomplish, during which Defendant Enriquez was present in and around a roadside motel and truck stop in Roadforks, N.M. along with the various other people involved in the operation. On the second day of the operation Defendant Enriquez was also in Douglas, Arizona, where he obtained a temporary registration for the gooseneck trailer that was used to transport the marijuana in a secret compartment. One of the participants was a confidential informant ("CI"), and another was an undercover narcotics agent; the entire operation was under surveillance by law enforcement, and the marijuana was recovered in Arizona before reaching its destination.

Agent Israel Barrera worked as an undercover narcotics officer for the Border Operations Task Force of the Bureau of Immigration and Customs Enforcement in Deming, New Mexico. Tr. at 26. In February 2000 Agent Barrera was contacted by a CI who told him that a person by the name of Memmo Anaya was looking for a contact in the U.S. to orchestrate smuggling marijuana. Tr. at 68-69. On March 3, 2000 the CI called Agent Barrera and told him that Memmo Anaya had a load of marijuana he wanted to move between March 5 and March 7 that would be brought to New Mexico by walkers. Tr. at 69. The CI introduced Agent Barrera to Memmo Anaya as a corrupt local sheriff's deputy familiar with the area known as the "bootheel" of southwestern New Mexico, a remote desert area near the Mexican border. Tr. at 27-28, 68-69.

On March 7, 2000 Agent Barrera met with the CI and Memmo Anaya in Lordsburg, N.M. to discuss bringing a load of marijuana up through the bootheel and delivering it to its destination with Barrera's assistance. Tr. at 32. Agent Barrera drove Memmo Anaya and the CI to a

truckstop in Roadforks, N.M. to wait for a driver with a pickup and a gooseneck trailer that would be used to transport the load of marijuana. Tr. at 75-76. Those vehicles did not show up because of problems with the driver, tr. at 33-34, an elderly male who had driven for them before, who they later found out would not be able to make it. Tr. at 76-78. Barrera was told later that evening that arrangements had been made for a different driver. Tr. at 79-80.

On March 8, 2000 Agent Barrera got a call from the CI telling him to meet them a while later at the truckstop in Roadforks. Tr. at 80. At the truckstop, Agent Barrera saw two Hispanic men drive up in a red Dodge "dually" pickup truck. Tr. at 81. Memmo Anaya went over and spoke to the two men, and told Agent Barrera to show them his badge, in order to demonstrate that he was a dirty cop. Tr. at 81-82. Agent Barrera identified Defendant Enriquez as one of the two men in the Dodge dually, seated in the passenger seat. Tr. at 82, 111, 113. Agent Barrera showed his badge to the two men out the window of his undercover vehicle. Tr. 82, 111. After Agent Barrera flashed his badge and the men in the pickup left, Memmo Anaya told Barrera that the men were pleased with Anaya, and that it was going to be his, Anaya's, operation. Tr. at 82. Plans were made to deliver the marijuana load the next day. Tr. at 33-34. Later, the CI called Barrera and told him to meet them at noon on March 9, 2000. Tr. at 82.

Meanwhile, in early March 2000, Defendant Leticia Torres-Drewel spoke with an uncle in Mexico regarding getting money for an eye operation for her mother. Tr. at 194-196. Ms. Torres-Drewel later spoke with a relative who offered to help them financially if she would pick up a truck with fencing equipment in New Mexico, and deliver it to Arizona. Tr. at 197-198. Ms. Torres-Drewel told the relative that she and her mother could do it the next day, which was March 9, 2000. Tr. at 198. The relative told Ms. Torres-Drewel to be in Douglas, Arizona the

4

next day and wait at a convenience store there for a friend of his who would meet them with the truck.  Tr. at 198.  Ms. Torres-Drewel told the relative she would be driving a white convertible Chrysler LeBaron.  Tr. at 198.

On March 9, 2000 Defendant Torres-Drewel drove with her mother to Mexico to visit her uncle (the mother's brother), then crossed back into Arizona to wait for the relative's friend at the convenience store in Douglas.  Tr. at 176, 198-200.  They waited about an hour, and then two men came up to their car and one of them, whom Ms. Torres-Drewel identified as Defendant Enriquez, told them in Spanish to follow them to the Motor Vehicle Department to register the trailer.  Tr. at 201.  In addition to the gooseneck trailer, the two men had a red pickup truck that had crossed the border from Mexico that morning.  Tr. at 176.  On that day, March 9, 2000, Defendant Enriquez registered the gooseneck trailer in his name and got a temporary tag for the trailer.  Pl. Ex. 18, Tr. at 125-127, 139-141, 168.  Under the flat bed of the trailer was a hidden or false compartment.  Tr. at 39, 50-51.  The two men told Ms. Torres-Drewel to follow them, and they took off on a road towards Rodeo, New Mexico.  Tr. at 202.  Once they got to Rodeo, the two women exchanged vehicles with the two men; Ms. Torres-Drewel drove the pickup and gooseneck trailer into Animas, N.M. and the men drove Ms. Torres-Drewel's LeBaron to Roadforks.  Tr. at 203-205, 209.

Agent Barrera met with Memmo Anaya in Roadforks, where he saw Defendant Enriquez standing outside the truckstop.  Tr. at 34.  Memmo Anaya told Barrera to follow them to Animas where the truck and trailer was to be driven.  Tr. at 35-36.  In Animas they met up at the Panther Tracks Cafe.  Tr. at 37.  There, Agent Barrera saw the red pickup and the gooseneck trailer driven by Defendant Torres-Drewel, with her mother in the passenger side.  Tr. at 39, 92, 248.

Memmo Anaya asked Barrera if he would be willing to drive the truck and trailer, to which he agreed. Tr. at 40. Barrera then drove with the two women from Animas to try to find the marijuana load, which they were unable to do. Tr. at 40-43, 206-207. They drove back to Animas, where they met with Memmo Anaya and the CI. Tr. at 43, 208. Barrera drove his own vehicle back to Roadforks, and Ms. Torres-Drewel drove the truck and trailer to Roadforks. Tr. at 43, 208, 210-211. At some point on March 9, Agent Barrera saw Defendant Enriquez in Roadforks leaning up against the LeBaron. Tr. at 34, 85, 113.

Back in Roadforks, Memmo Anaya told Agent Barrera to stay inside the truckstop. Tr. at 44, 46. The CI told Agent Barrera, while he was inside, that the bosses of the organization were in the parking lot. Tr. at 46. Agent Barrera looked out a window and saw Memmo Anaya walk over to a small silver car. Tr. at 47. Barrera saw Defendant Enriquez and two other people sitting inside the silver car talking. Tr. at 47. Memmo Anaya entered the truckstop and asked Agent Barrera if he could attempt the delivery the next day. Barrera agreed to do it for an additional $2000, but Barrera said he preferred to drive down to the bootheel without the two women to pick up the marijuana. Tr. at 44. That night Defendant Enriquez registered to stay at the motel in Roadforks, across the street from the truckstop. Pl. Ex. 21, Tr. at 168-169. Defendant Torres-Drewel and her mother also stayed overnight at the same motel. Pl. Ex. 22, Tr. at 171-172.

On March 10, 2000 a man knocked on Defendant Torres-Drewel's motel room door, gave her the keys to her LeBaron, and took from her the keys to the pickup truck. Tr. at 212. Agent Barrera arrived and took the truck and trailer to Animas. Tr. at 46-48. Ms. Torres-Drewel and her mother stayed in Roadforks most of the day, waiting in the restaurant. Tr. at 212. In Animas,

Barrera met with Memmo Anaya and got more specific directions from him about the location of the marijuana load. He then drove south and finally found the backpackers, who loaded the marijuana into the hidden compartment under the flat bed of the trailer. Tr. at 52-57. Barrera then drove back to Animas and met with Memmo Anaya, and then he followed Anaya and the CI back to Roadforks. Tr. at 58. Anaya led Barrera into an open area near the motel. Tr. at 58-60. Anaya and the CI then drove Barrera across the street to the truckstop where Barrera's vehicle was parked. Tr. at 59-60.

In Roadforks, a man gave the truck keys to Defendant Torres-Drewel and took from her the LeBaron keys. Tr. at 212-213. Agent Barrera saw the two women walk quickly out of the truckstop and across the street to the motel area where the truck and trailer were parked. Tr. at 61. A few minutes later, as he was backing out of his parking space in his own vehicle, Agent Barrera saw Defendant Enriquez walk out of the truckstop. Tr. at 61, 105. As he was driving out, Agent Barrera slowed down to let Mr. Enriquez pass in front of his vehicle. Tr. at 61. At that point, Defendant Enriquez motioned for Barrera to pass by, so Barrera continued on and proceeded to drive out and enter the freeway. Tr. at 62-63. Agent Barrera saw Enriquez walk toward the LeBaron but did not see him get into it. Tr. at 62-63, 106-109. Defendant Torres-Drewel had been told to drive the pickup to Tucson, Arizona, and that her LeBaron would follow them and in Tucson the LeBaron would move in front and show her where to drop off the truck and trailer. Tr. at 212-213. Ms. Torres-Drewel saw her LeBaron following them after she got onto the freeway. Tr. at 213. The truck and trailer were pulled over for a traffic violation in Arizona, where Defendant Torres-Drewel consented to a search, and the marijuana was found in the hidden compartment of the trailer. Tr. at 114- 125, 213-217. The white Chrysler LeBaron,

7

suspected as being the "heat vehicle," was not found. A few days later, Defendant Torres-Drewel recovered the LeBaron from her uncle's house in Mexico. Tr. at 220.

**Discussion.**

Count I of the Indictment charges a conspiracy to possess a large quantity of marijuana with the intent to distribute it:

> On or about the 10th day of March, 2000, in Hidalgo County, in the State and District of New Mexico and elsewhere, the defendant, **JAIME ENRIQUEZ,** did unlawfully, knowingly and intentionally combine, conspire, confederate and agree together and with **LETICIA TORRES-DREWEL,** and with other persons whose names are known and unknown to the grand jury to commit the following offense against the United States, to wit: Possession with intent to distribute 100 kilograms and more of Marijuana, a Schedule I controlled substance, contrary to 21 U.S.C. § 841 (a)(1) and 21 U.S.C. § 841 (b)(1)(B).
> In violation of 21 U.S.C. § 846.

To prove a conspiracy under 21 U.S.C. § 846, the government must prove the following elements beyond a reasonable doubt: (1) agreement with another person to violate the law; (2) knowledge of the essential objectives of the conspiracy; (3) knowing and voluntary involvement; and (4) interdependence among the alleged co-conspirators. United States v. Dozal, 173 F.3d 787, 797 (10th Cir. 1999); United States v. Pedraza, 27 F.3d 1515, 1524 (10th Cir. 1994).

The essence of a drug distribution conspiracy is an agreement between two or more persons to traffic in controlled substances. United States v. Horn, 946 F.2d 738, 740 (10th Cir. 1991). To establish the element of agreement, the government's evidence must show a unity of purpose or a common design and understanding with coconspirators to accomplish one or more of the objects of the conspiracy. United States v. Williamson, 53 F.3d 1500, 1517 (10th Cir. 1995).

To obtain a conviction under the drug conspiracy statute, 21 U.S.C. § 846, the government need not prove an overt act. *See* United States v. Johnson, 42 F.3d 1312, 1319 (10th Cir. 1994). Instead, the government must prove that the defendant knew at least the essential objectives of the conspiracy and knowingly and voluntarily became a part of it. Id. The fact of a defendant's presence at the crime scene is material and probative, but mere presence is not sufficient in and of itself, United States v. Nicholson, 983 F.2d 983, 989 (10th Cir. 1993). Also, it is not sufficient for the government to show only mere association with conspirators known to be involved in crime, and the government must do more than show there were casual transactions between the defendant and the other conspirators. United States v. Evans, 970 F.2d 663, 669 (10th Cir. 1992). While the jury may draw reasonable inferences from direct or circumstantial evidence, an inference must be more than speculation and conjecture to be reasonable, and caution must be taken that the conviction not be obtained by piling inference on inference. United States v. Jones, 44 F.3d 860, 865 (10th Cir. 1995).

The element of interdependence is shown "if a defendant's actions facilitated the endeavors of other coconspirators or facilitated the venture as a whole." United States v. Powell, 982 F.2d 1422, 1429 (10th Cir. 1992). There was direct evidence of interdependence because Defendant Enriquez registered a trailer with a secret compartment in his name, which facilitated both the transportation of the drugs and the avoidance of detection of the drugs by law enforcement. Also, a reasonable inference can be made that Defendant Enriquez facilitated the venture as a whole because he was in Roadforks for three days until Defendant Torres-Drewel and her mother took off with the load of marijuana to deliver it in Arizona.

The rest of the case against Defendant Enriquez was based on circumstantial evidence

9

because there was no direct evidence that Enriquez made an agreement with anyone to distribute drugs, that he knew the essential objectives of the conspiracy, or that his involvement in the conspiracy was knowing and voluntary.  Factors the jury may consider in drawing the inference of a conspiracy include, but are not limited to:  (1) a defendant's presence at the crime scene; (2) a defendant's association with co-conspirators; (3) evidence of conflicting stories; (4) active attempts to divert officers' attention from a stopped vehicle; (5) participation in drug transactions; or (6) knowledge of and control over drugs.  *See* Jones, 44 F.3d at 868.  Any single factor, standing alone, may be insufficient to support an inference of a conspiracy.  *See* United States v. Riggins, 15 F.3d 992, 994 (10th Cir. 1994).  A direct correlation exists between the number of circumstantial facts and the existence of a conspiracy.  *See* United States v. Delgado-Uribe, 363 F.3d 1077, 1083 (10th Cir. 2004).

   Defendant Enriquez associated closely with Memmo Anaya, who was a central figure in the drug distribution conspiracy.  Enriquez was with Memmo Anaya during all the crucial events at the "crime scene" in Roadforks, N.M., which operated as the organization's headquarters for three days between March 8 and 10, 2000.  During that time, the organization was trying to get the load of marijuana picked up from a remote desert location in the bootheel area of New Mexico, transferred to a trailer, and transported to Arizona.

   Agent Barrera first saw Defendant Enriquez at the truck stop in Roadforks, N.M. on March 8, 2000.  Defendant Enriquez was in the passenger seat of a vehicle described as a red Dodge dually pickup.  Memmo Anaya told Agent Barrera to flash his badge at the two men in the pickup, after which the men seemed pleased with Memmo's handling of the situation.  From this evidence it can reasonably be inferred that Enriquez was knowingly involved in the conspiracy.

The expected driver and transport vehicles did not appear on that day, and so the events in Roadforks and in Arizona continued to unfold, and Enriquez continued to be involved.

On March 9, 2000 Defendant Enriquez was with another man in Douglas, Arizona when co-Defendant Leticia Torres-Drewel and her mother met up with them at a convenience store. The two women had agreed with a relative in Mexico to drive a truck from New Mexico to Arizona in exchange for money for the mother's eye operation. Enriquez told Torres-Drewel in Spanish to follow them to the MVD, where Enriquez registered the trailer in his name. Ms. Torres-Drewel had refused to register the trailer in her name. It can reasonably be inferred that as the registered owner of the gooseneck trailer with a secret compartment in which the marijuana was concealed, Defendant Enriquez knew that the flatbed trailer was equipped with the secret compartment, and knew that the trailer would be used to transport some illegal substance and to conceal it from law enforcement.

The two women then followed Enriquez and the other man to Rodeo, N.M. where the two women exchanged vehicles with the men and drove on to Animas, N.M. in the truck and trailer, where they met up with Agent Barrera. The men drove Torres-Drewel's LeBaron to Roadforks. Back in Roadforks later that day, after the unsuccessful venture by Barrera and the two women into the desert to find the marijuana load, Enriquez was seen sitting in a vehicle with two men who had been identified by the CI as "the bosses." This is perhaps the most damning "association" evidence. The fact that Defendant Enriquez was seen talking to the alleged bosses of a drug operation leads to the reasonable inference that Defendant Enriquez was aware there was a drug operation in process, and therefore that Defendant Enriquez was knowingly involved in the drug conspiracy.

Defendant Enriquez stayed overnight in the motel in Roadforks, N.M. on the night of March 9, as did co-Defendant Leticia Torres-Drewel and her mother. In fact, Enriquez stayed in Roadforks until late in the day on March 10 after the marijuana load was successfully found in the desert by Agent Barrera, loaded into the secret compartment of the trailer, and brought back to Roadforks. Defendant Enriquez did not leave Roadforks until after the two women took off with the load of marijuana headed to the delivery point somewhere in Tucson. Defendant Enriquez was seen standing near the white Chrysler LeBaron shortly before the LeBaron backed out of the parking lot to follow the load vehicle. It may be reasonably inferred from this evidence that Defendant Enriquez knew the essential objectives of the drug conspiracy, and that he knowingly and voluntarily was a part of the conspiracy.

Viewing the evidence presented in Plaintiff's case in chief in the light most favorable to the government, the Court determines that there is substantial evidence from which a jury could have found Defendant Enriquez guilty of a drug distribution conspiracy as charged in Count I beyond a reasonable doubt.

THEREFORE IT IS ORDERED that Defendant Enriquez' Motion for Judgment of Acquittal is DENIED.

_____
SENIOR UNITED STATES DISTRICT JUDGE